UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                    :
DINO J. SALATI,
                                                    :
                        Plaintiff,                              OPINION AND ORDER
                                                    :
            -against-                                           18 Civ. 8136 (GWG)
                                                    :
ANDREW SAUL, Commissioner
of Social Security,[1]                              :

                        Defendant.                  :
------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

         Plaintiff Dino Salati brings this action pursuant to 42 U.S.C. § 405(g) for judicial review

of the final decision of the Acting Commissioner of Social Security (the "Commissioner")

denying his application for a period of disability and disability insurance benefits under the

Social Security Act (the "Act").  Salati seeks remand of the case and the Commissioner moves

for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[2]  For the

reasons stated below, Salati's motion is denied and the Commissioner's motion is granted.

I. <u>BACKGROUND</u>

         A. <u>Procedural History</u>

         Salati first filed his application for a period of disability insurance benefits ("DIB") on

_____

         [1]  Andrew Saul, who became Commissioner of Social Security on June 17, 2019, is
automatically substituted as defendant pursuant to Fed. R. Civ. P. 25(d).

         [2]  <u>See</u> Motion for Summary Judgment, filed Feb. 8, 2019 (Docket # 15); Memorandum of
Law in Support of Plaintiff's Motion for Summary Judgment on the Pleadings, filed Feb. 8, 2019
(Docket # 16) ("Pl. Mem."); Notice of Motion, filed Apr. 2, 2019 (Docket # 17) (also docketed
at # 19); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on
the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, filed Apr.
2, 2019 (Docket # 18) (also docketed at # 20) ("Comm'r Mem."); Letter from Joseph A.
Romano, Esq, filed May 2, 2019 (Docket # 21) (also docketed at # 22) ("Reply Letter").

January 10, 2011, alleging a disability onset date of April 15, 2010. <u>See</u> Certified

Administrative Record, filed Dec. 10, 2018 (Docket # 13) ("R."), 527-32, 533. The Social

Security Administration ("SSA") denied Salati's application on May 4, 2011. R. 301-08. Salati

requested a hearing before an administrative law judge ("ALJ") to review the denial, which

occurred on September 24, 2012. R. 189-245. In a written decision dated November 16, 2012,

the ALJ found that Salati was not disabled within the meaning of the Act. R. 247-66. Salati

requested that the Appeals Council review the ALJ's decision, and on December 23, 2013, the

Appeals Council granted Salati's request for review, vacated the ALJ's decision, and remanded

the case to the ALJ for further proceedings. R. 267-70. On June 25, 2014, a hearing was held

before the same ALJ. R. 150-88. On March 18, 2015, a supplemental hearing was held, R. 102-

49, and in a written decision dated August 13, 2015, the ALJ again found that Salati was not

disabled within the meaning of the Act, R. 271-91. Salati requested that the Appeals Council

review the ALJ's decision, and on December 9, 2016, the Appeals Council granted Salati's

request for review, vacated the ALJ's decision, and remanded the case to a different ALJ for

further proceedings. R. 292-96. On August 2, 2017, a hearing was held before a different ALJ.

R. 40-101. In a written decision dated September 21, 2017, that ALJ found that Salati was not

disabled within the meaning of the Act. R. 15-39. The Appeals Council denied Salati's request

for review on July 23, 2018. R. 1-6. Salati timely filed this action on September 6, 2018.

Complaint, filed Sept. 6, 2018 (Docket # 1).

 B. <u>The Hearings Before the ALJs</u>

  1. <u>The September 2012 Hearing</u>

 Salati's first hearing occurred on September 24, 2012, in the Bronx, New York, before

ALJ Seth Grossman. R. 189. Salati was represented by attorney Michael Catallo of the firm

Bartlett, McDonough & Monaghan.  R. 191.  Also present and testifying were vocational expert ("VE") Andrew Vaughn, and medical expert Ronald Kendrick, who testified via teleconference. R. 191, 455-56, 367-68.

Salati, 38 years old at the time, last worked as a union construction laborer in April 2010 and testified that he stopped working because he "physically couldn't take . . . the work anymore."  R. 194-95.  He worked in this capacity for at least 18 months around 2008 to 2010. R. 209-10.  Salati's duties included "cleaning up after the carpenters are done working" and "sometimes" doing "physically hard labor," which meant lifting up to 40 or 50 pound at a time. R. 195.  At the time of the hearing, Salati was taking at least two hydrocodone or oxycodone pills each day for pain in his right leg, shoulder, left arm, and hip.  R. 199-200.  This ongoing pain stemmed from an automobile accident in which Salati was involved in 1999.  R. 208. Salati's good friend was killed in the accident, and Salati had to undergo over 30 operations over the next few years.  R. 209.  Salati experiences occasional headaches, which last one to three hours, occur once or twice a month, and are severe enough where he must lay down, turn the lights off, and lie in "total silence."  R. 200, 204.  The headaches are made worse by "[b]ad weather," and are only sometimes alleviated by taking Excedrin.  R. 205.

Salati testified to his impairments and resulting pain and limitations.  He stated that he could not perform a job involving mostly sitting because he "can't sit and stand for long periods of time with the pain."  R. 196.  He can only stand for around 30 minutes at a time and sit for around 90 minutes at a time.  R. 197, 200-01.  He uses a cane, mostly "when the weather changes" from summer to fall and fall to winter, and also when it rains.  R. 202, 204.  He sometimes has difficult gripping things with his left hand due to injuries sustained in the car accident.  R. 213.  He has no vision in his left eye, and imperfect vision in his right eye.  R. 213.

Salati has had trouble sleeping since his accident — sleeping only four hours a night on average — and sometimes takes prescription Ambien to help fall asleep. R. 206. In addition to treating Salati for pain management, Salati's physician, Dr. Brizer, treats Salati for psychiatric issues stemming from the 1999 accident. R. 208. Salati testified to taking Valium for anxiety, R 206, which "comes and goes," especially when he is out in public or in a vehicle on the highway, R. 210. Due to his anxiety over driving, Salati has not driven a car in several years. R. 211.

Salati testified to his activities of daily living. His mother cooks for him and does the laundry. R. 211-12. On a normal day, Salati can dress himself, eat breakfast, and drive with his mother to go to the store and run errands. R. 212. Salati also "look[s] after" and spends time with his elderly father. R. 212.

Dr. Kendrick, who is a board certified orthopedic surgeon, R. 191, testified next. Dr. Kendrick discussed Salati's injuries sustained in the 1999 accident, and the resulting psychiatric problems including anxiety and posttraumatic stress disorder. R. 215-16. Dr. Kendrick opined that based on the objective evidence in the record regarding physical impairments, Salati would be able to perform sedentary work "from an orthopedic standpoint." R. 217. Dr. Kendrick testified that the "only thing" that would show "any significant deterioration" since April 2010 "from an orthopedic standpoint" was the development of arthritis in Salati's right ankle, which would not prevent someone from doing sedentary work. R. 218. Dr. Kendrick also testified that there did not "seem to be any objective basis" in the record for back pain. R. 218.

The VE testified next. The VE began by confirming that he would let the ALJ know if he gave any testimony that conflicted with the information in the Dictionary of Occupational Titles ("DOT"). R. 225-26. The ALJ asked the VE a series of hypothetical questions. First, the ALJ asked whether a hypothetical individual of Salati's education and vocational background,

who was limited to unskilled sedentary work — i.e., "simple repetitive sedentary work" — would be able to perform any of Salati's past relevant work. R. 228. The VE confirmed he could not. R. 228-29. Next, the ALJ asked if any jobs existed for a similar hypothetical individual limited to "unskilled, sedentary work with a sit/stand option with no use of the left eye with good vision in the right eye." R. 229. The VE stated that this individual could perform three nationally-available jobs: buckler and lacer, lens inserter, and order clerk. R. 230-31. If an individual were to require 10- to 20-minute breaks every hour, that person "would be unable to maintain competitive employment at an unskilled level." R. 232-33. As to a similar hypothetical individual who gets severe headaches twice a month for up to three hours at a time, the VE testified that this was a "gray area" and he could not answer the hypothetical. See R. 234-35. The VE stated that the answer to whether such an individual could perform the three jobs of buckler and lacer, lens inserter, and order clerk, would depend and be "based on the work environment." R. 238.

### 2. The June 2014 Hearing

Salati's second hearing occurred on June 25, 2014, in the Bronx, New York, again before ALJ Grossman. R. 150. Salati gave testimony and was represented by his attorney Rikki Riesa from the Law Office of Joseph Romano. R. 153.

Salati testified that he was 40 years old and last worked in 2010, when he had a job as a "foreman laborer, light duty labor worker" but got to the point "where [he] couldn't do it anymore with the disabilities" he has. R. 155-56. In his capacity as a laborer, Salati was in charge of around four people and would engage in cleaning up, sweeping, and "making sure the guys did their jobs." R. 156. Salati never had to lift anything exceeding 20 to 30 pounds. R. 157. During an eight-hour work day, Salati would spend about half of the day standing and

half sitting.  R. 157-58.

After he was laid off from work, see R. 170, Salati collected unemployment insurance for about a year, and in connection with the unemployment insurance, certified that he was "ready, willing, and able to work full-time in [his] normal job capacity."  R. 158.  When the ALJ questioned Salati as to how he could have claimed to be able to work around that time period but to then claim in 2014 to be disabled, Salati stated:

> [T]he reason I went back to work is because when the Social Security is taken away from me, I had no money at all.  I was forced to go back to work.  So, when I did, and at the end of 18 months, I couldn't do the work anymore.  So, I was also laid off.  I was laid off, and I collected unemployment, and after that [I] never worked again. . . .  The job ended and there was no more work.  So, they put me on unemployment automatically.  So, when the unemploy[ment] was over, it was over, and that was it.  I could go back to work.

R. 159-60.  The ALJ then explained:

> ALJ: Right, so now you're coming and you're saying that during that time period you were unable to work, because that's the basis of your claim for disability insurance.  Do you understand what I'm saying?

> SALATI: Yes, I understand.

> ALJ: Do you understand the contradiction in the two?

> SALATI: Yes, now I do.

R. 160-61.  The ALJ then asked Salati whether when he left his construction job he thought he would be "capable of doing a desk job," and Salati responded that he could not.  R. 163.  As to whether he thought he could perform a job with a "substantial sit, stand option" (sitting and standing at his own will) and with a restriction of never having to carry more than 10 pounds, Salati indicated that he could, because he had performed his construction job.  R. 163-64.

Salati testified regarding his conditions and current treatment.  Although Salati has a pain management doctor, Dr. Fishko, he is not engaged in any other current treatment to treat his

conditions.  R. 164.  As to his mental impairments that came about after the 1999 accident, Salati testified that he suffers from short-term memory problems, nightmares, and sleep disorder. R. 167.  Physically, he experiences pain in his legs, shoulder, and hands, all stemming from the accident.  As to his legs, Salati experienced breaks in both legs and still has a metal rod in his right leg, though the rod that was used to heal his left leg was eventually removed.  R. 171. However, "the pain is still consistent [in his legs] from the day of the accident."  R. 171.  Salati stated that it is a "sharp pain," like "a knife getting stuck into [his] leg when the weather gets bad."  R. 177.  Due to this pain, Salati can only sit for around 40 to 45 minutes before he needs to get up and stretch, though he can stand for "about an hour" and "walk about a block, block-and-a-half" before he has to stop.  R. 178.  Salati also broke both arms in the accident, and the pain he experiences in his arms has been similarly consistent and "radiating" throughout his arms and hands.  R. 171, 179.  Salati also has tendinitis and lower back pain.  R. 171-72.

As to his activities in daily life, Salati stated that he can drive only during the day for short periods of time.  R. 172.  For instance, he can drive his elderly father to the store.  R. 172. Salati can read, but his memory is impacted from the accident: "If I read five pages, I have to go back and read them again."  R. 173.  Salati watches television and occasionally reads a newspaper, but does not spend much time on the computer and cannot play video games because doing so hurts his eyes.  R. 174.  Although he can type on a computer and write, he cannot do so for long periods of time because of the arthritis in his hands.  R. 180.  He can watch a full one-hour television program, although if he is watching a movie, he sometimes has to rewind the movie and re-watch a portion he had trouble understanding.  R. 174.  Salati has not had a neurological examination for his memory problems since the 1999 accident, although he states that the condition has gotten worse since that time.  R. 175.  This has resulted in symptoms

including claustrophobia and fear of driving on the highway, although Salati also testified that he does sometimes drive on the highway including on the Bronx River Parkway. <u>See</u> R. 175. Salati testified that he could "[p]robably" lift 15 pounds with both hands. R. 180.

Salati testified to his current medications. He was still taking oxycodone daily, a narcotic for pain management, and also takes Xanax. R 173. Side effects from the oxycodone include drowsiness, and both medications make it more difficult to concentrate. R. 173. Salati uses a cane that was prescribed by his doctor. R. 176-77.

### 3. The March 2015 Hearing

A supplemental hearing was held on March 18, 2015, in the Bronx, New York, before ALJ Grossman. R. 102. Salati gave testimony and was represented by his attorney, Joju Thomas of the Law Office of Joseph Romano. R. 104. Also testifying were a VE, Esperanza DiStefano, and Dr. Kendrick, the same medical expert who testified at the hearing in 2010. R. 102, 455-56, 457-58.

Salati gave testimony similar to what he gave at his previous hearings. He testified regarding his previous work as a construction laborer, R. 105-06, 115-17, 120-21; the 1999 car accident in which he was involved, R. 106-07; and his daily activities, including watching television, reading the news on his computer, keeping in touch with people on Facebook, and playing games on the computer, R. 108-10. Salati has some friends, and spends time with them watching television and "hang[ing] out," and also travels to visit his family. R. 110.

Salati testified that he could not work due to his physical limitations even at a "desk job." R. 112-14. He has trouble walking up and down stairs or walking up hills due to his leg pain, and uses a medically prescribed cane "[a]s needed." R. 117-18. When sitting for more than approximately 20 minutes, Salati experiences numbness, which sometimes occurs in his feet,

ankles, knees, buttocks, thighs, or hip. R. 118. As to his memory loss, Salati stated that he is

"[d]ealing with it" because "there's no treatment for it." R. 119. He is not treating with any

psychologist or neurologist, although Salati does take pain and anxiety medications. R. 119-22.

Dr. Kendrick testified that there was no evidence that between April 2010 and March 31,

2013, that Salati was unable to perform sedentary work. R. 125. Dr. Kendrick also agreed with

the statement that Salati could perform "at least light work," and that even if he had "more

problems" he could "still probably do sedentary work." R. 125. Dr. Kendrick acknowledged

that "any activity," including working as a construction laborer, could "exacerbate" Salati's pain.

R. 126-27.

Finally, the ALJ posed a series of hypothetical scenarios to a VE. The VE opined that a

"hypothetical person [with] the claimant's education, vocational background who is limited to a

simple task instruction job, and sedentary [work]" with a sit/stand option for alternating sitting

and standing every half hour could perform the job of an order clerk. R. 141. The VE opined

that such an individual could also perform the jobs of: accounts clerk, surveillance system

monitor, and call out operator. R. 143. The VE stated that although the DOT is silent regarding

the sit/stand option, the VE's testimony was based on her own professional opinion and

experience. R. 144. On the other hand, the VE confirmed that if such an individual had to "walk

away" from their workstation every half hour for an additional half hour, that individual would

be impermissibly off task. R. 145-46. The VE could not recall for each of these jobs the last

time she performed a specific job analysis. R. 147-48.

### 4. The August 2017 Hearing

A fourth hearing was held on August 2, 2017, in the Bronx, New York, before a new

ALJ, Kimberly Schiro. R. 40. Present at the hearing, Salati again gave testimony and was this

time represented by his attorney, Arre Costa from the Law Office of Joseph Romano.  R. 45.  Also present and testifying was a new VE, Susan Howard.  R. 79, 681.

Salati testified that he was 43 years old and achieved an equivalency of a high school diploma.  R. 50-51.  He testified to the circumstances of his 1999 accident and the resulting surgeries.  R. 51-52.  He testified to his post-accident construction work as a laborer and his ownership of a Subway franchise.  R. 52-53, 59-60.  When Salati previously applied for benefits, he indicated that he stopped working because work was slow.  R. 53.  He also noted that the Subway franchise was a "losing venture," in which he lost most of the money he had received in a settlement from the car accident.  R. 53-54.

Salati testified that he was hired as a construction foreman by a cousin and friend of his, and that he eventually realized he could not work anymore due to the "stress" on his legs and body.  R. 55.  As to why he returned to work at all, Salati stated: "I have to work.  I'm not feeling better, but I needed money.  So, I didn't really have a choice [other] than live out on the streets."  R. 57.   He reiterated that he could not perform a "desk job" because of his inability to "sit for long periods of time or stand for long periods of time" due to the pain in his lower back, right hip, knees, and ankles.  R. 56.  The pain starts after "about an hour" of sitting or standing.  R. 56.

As to daily activities, Salati again testified that he relies on his parents to cook and do laundry, although he does what he can to "tend the house."  R. 59.  He testified about his limited driving and his hobby of painting abstracts.  R. 68-69.  He socializes with friends, and at the time had recently celebrated the Fourth of July by lighting fireworks with them.  R. 71.  He "get[s] out to do things" that are social about twice a week.  R. 71.

Salati began treating with Dr. Brizer, a psychiatrist and pain management specialist,

around April 2010, R. 61, although Salati had also treated with that same doctor immediately following the 1999 accident, R. 62. Salati takes pain (oxycodone, 30 milligrams) and sleep medications, and "low milligram Valium for anxiety." R. 62-63. He has been on chronic pain medications since 1999, and takes four oxycodone pills each day. R. 63. Salati also saw an orthopedist, though the ALJ noted a gap from June 2012 to April 2014 during which there was no treatment. R. 65-66. Salati stated that "[t]he reason for the gap is because the two different hearings I had here. I had to go see him prior to come here." R. 66-67. In other words, he continues to experience pain, but no longer needs the orthopedist. R. 67. Salati testified regarding his pain, and about how it worsens with bad weather. R. 69-70. He specifically explained his difficulties lifting and reaching; for instance, with getting dressed in the morning, which can be difficult at times. R. 77-79.

The VE then testified. First, the ALJ asked her to consider the following hypothetical:

If you, assume the individual [is] the claimant's age at this time of the date last insured, even now, is a younger individual with a high school equivalent education who is capable of performing simple routine tasks at the sedentary exertional level. The individual can only [stand or walk] for short periods of time of ten to 15 minutes at most, but up to two hours in total in a workday. Additionally, the individual needs a five-minute stretch break for every hour of sitting to sit, stretch, rest otherwise do whatever they want. So, five minutes for every hour. The individual cannot climb ladders, ropes, or scaffolds or work at a hazard, which I would describe as moving mechanical parts or unprotected heights. The individual can occasionally climb ramps and stairs with occasional balance, kneel, stoop, crouch, and crawl. . . . The individual can occasionally reach over ahead with the bilateral overage extremities. . . . The individual can frequently finger, handle with the bilateral upper extremities. The individual requires a [cane] for standing or ambulation. . . . The individual cannot perform work, which requires binocular vision or perform work, which requires keen depth perception, or good peripheral vision on the left side. Because, you know, he's unable to see in the left eye. . . . However, the individual is able to avoid ordinary workplace hazards. Normal vision in the remaining eye.

R. 80-82. As to this set of limitations, the VE stated that such a hypothetical individual could

perform jobs of addresser, "[o]rder clerk, food and beverage," and touch-up screener. R. 83-84. The VE further confirmed that those jobs would allow for a morning, lunch, and afternoon break, which could accommodate any need "to take breaks to lie down, or rest, to do whatever they want." R. 84-85. Second, if the individual were limited to "occasional" use of hands for "fingering and handling," that would preclude work as addresser, "[o]rder clerk, food and beverage," and touch-up screener, although such a person could perform the job of surveillance system monitor. R. 85.

Salati's attorney questioned the VE next. The VE confirmed that if the individual in the first hypothetical could "only occasionally reach in any direction bilaterally," that person could still perform the jobs of surveillance system monitor and call out operator. R. 86. However, if the individual needed an additional 15-minute break in addition to the five-minute breaks every hour, that "would not be tolerated." R. 90. If the hypothetical individual could "only sit for one hour total [i]n an eight-hour day, such a person could not perform" any of the jobs mentioned by the VE. R. 96.

C. The Medical Evidence

Salati and the Commissioner have both provided summaries of the medical evidence in the record. See Pl. Mem. at 4-20; Comm'r Mem. at 5-18. The summaries are substantially consistent with each other. Additionally, the Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Dec. 10, 2018 (Docket # 14), ¶ 5, and neither party has done so.[3] Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the

---

[3] Although given the opportunity to respond to the Commissioner's brief, Salati advised that he would "stand[] on [his] motion for summary judgement on the pleading . . . in support of the Plaintiff's application." Reply Letter.

issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

D.  The ALJ's Decision

The ALJ denied Salati's DIB application on September 21, 2017.  R. 18-30.  First, the ALJ found that Salati last met the insured status requirements of the SSA on March 31, 2013. R. 20.  Then, following the five-step test set forth in SSA regulations, the ALJ found at step one that Salati had not engaged in "substantial gainful activity" during the period from his alleged onset date of April 15, 2010, through his date last insured of March 31, 2013 (the "Relevant Period").  R. 20.  At step two, the ALJ found that during the Relevant Period, Salati suffered from "severe impairments" of

> status post motor vehicle accident-related injuries to the upper and lower extremities and surgical repair of the injuries, left shoulder disorder, left hand disorder, spinal disorder, hypertension, left eye blindness (status post left orbital and facial fractures and open reduction and fixation, status post surgical repair of the left lower eyelid ectropion), and mood disorder with anxiety.

R. 20.

At step three, the ALJ found that, during the Relevant Period, none of Salati's impairments, singly or in combination, met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  R. 21-22.  The ALJ gave particular attention to listings 1.02 (Major dysfunction of a joint), 1.04 (Disorders of the spine), 2.00 (Special Senses and Speech), 4.00 (Cardiovascular System), 12.02 (Neurocognitive disorders), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders).  R. 21-22.  As to the Listings concerning physical impairments, the ALJ found the medical expert's testimony at the March 2015 hearing to be persuasive on the issue of Listing equivalence, and adopted the finding that Salati's "physical impairments did not

meet or equal a listing at any point through the date last insured of March 31, 2013." R. 21. As to Listings 12.02, 12.04, and 12.06, the ALJ considered whether the "paragraph B" criteria were satisfied. R. 21. The ALJ found that the criteria were not satisfied because Salati's "mental impairment did not cause at least two 'marked' limitations or one 'extreme' limitation" in the "broad area[s] of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." R. 21, 20. Furthermore, the ALJ considered whether the "paragraph C" criteria were satisfied that found that they were not because the record did not "establish that [Salati] had only marginal adjustment, that is, a minimal capacity to adapt to changes in [his] environment or to demands that were not already part of [his] daily life." R. 22.

Having found that Salati did not meet or medically equal any of the Listings, the ALJ addressed Salati's residual functional capacity ("RFC"). The ALJ found that during the Relevant Period, Salati had the RFC to perform "simple, routine tasks at the sedentary exertional level, as defined in" 20 C.F.R. § 404.1567(a). R. 22. However, the ALJ also concluded that Salati was limited to performing that sedentary work in the following manner:

> He could stand and/or walk for short periods of time (10-15 minutes), but up to 2 hours total. He needed a five-minute break for every hour of sitting. He could not climb ladders, ropes or scaffolds or work around hazards (defined as moving mechanical parts or at unprotected heights). He could occasionally climb ramps and stairs, kneel, stoop, crouch, and crawl. He could reach overhead with the bilateral upper extremities and could frequently finger/handle with the bilateral upper extremities. He required a cane for standing/walking. He could not perform work, which required keen depth perception or good peripheral vision on the left side, but was able to avoid ordinary workplace hazards. He required other breaks throughout the day to rest or lie down, which could be accommodated by the usual morning, break, lunch and afternoon break.

R. 22-23. The ALJ noted that she made this assessment, "[a]s required by SSR 96-Sp, . . . based on all the evidence with consideration of the limitations and restrictions imposed by the

combined effects of all the claimant's medically determinable impairments." R. 23. She "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, . . . [and] considered opinion evidence" pursuant to SSA regulations. R. 23; see R. 23-28. The ALJ also considered Salati's symptoms and noted that although Salati "alleged disabling limitations resulting from injuries he sustained in motor vehicle accident-related in 1999," there was "substantial evidence of record in support of [the] conclusion that [Salati] could perform a limited range of sedentary work" as described in the decision. R. 23.

Having determined Salati's RFC, the ALJ evaluated at step four whether Salati could have performed any "past relevant work" as a small business owner or a construction laborer, and concluded that he could not. R. 28. At step five, the ALJ considered Salati's RFC and his age, education, and work experience in determining that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed." R. 29. Thus, although the ALJ found that Salati's "ability to perform all or substantially all of the requirements of [a level of sedentary] work was impeded by additional limitations," given all the evidence in the record, including testimony from a VE, the ALJ found that Salati would have been able to perform the requirements of representative occupations such as addresser, "order clerk, food and beverage," touch up screener, surveillance system monitor, and call out operator. R. 29. The ALJ found that, based on the VE's testimony, Salati could have performed the work of surveillance monitor and call out operator "even if [Salati] was limited to occasionally using his hands for fingering/handling." R. 29. The ALJ found the VE's testimony to be consistent with the DOT, and concluded that Salati was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy." R. 29. Accordingly,

the ALJ concluded that Salati had not been under a disability, as defined in the SSA, during the

Relevant Period.  R. 29-30.

II.  GOVERNING STANDARDS OF LAW

A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

It is not a reviewing court's function "to determine de novo whether [a claimant] is

disabled."  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation

marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).  Rather,

a court reviewing a final decision by the Commissioner "is limited to determining whether the

[Commissioner's] conclusions were supported by substantial evidence in the record and were

based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per

curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370,

374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson

v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229

(1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008);

Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131

(2d Cir. 2000).  The "threshold for such evidentiary sufficiency is not high."  Biestek v.

Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Id. (emphasis in original) (citations and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

B.  Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her

age, education, and work experience, permits the claimant to do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. The "Treating Physician" Rule

Under the so-called "treating physician" rule, in general, the ALJ must give "more weight to medical opinions" from a claimant's "treating source" — as defined in the regulations — when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[4] Treating sources, which includes some professionals other than physicians, see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Second Circuit has summarized the deference that must be accorded the opinion of a "treating source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion. First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, it must "explicitly

---

[4] Although the SSA has since revised its rules to eliminate the treating physician rule, because the claim here was filed before March 27, 2017, the rule applies in this case. See, e.g., Conetta v. Berryhill, 365 F. Supp. 3d 383, 395 n.5 (S.D.N.Y. 2019).

consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). . . . An ALJ's failure to "explicitly" apply the Burgess factors when assigning weight at step two is a procedural error. Selian, 708 F.3d at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).  Accordingly, the Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; accord Estrella, 925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran, 362 F.3d at 32 (citation omitted).  In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted).  Finally, a "slavish recitation of each and every [factor listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the

"Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'" Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

## III. DISCUSSION

Salati raises three grounds in support his motion to remand: (1) the ALJ "failed to comply with SSR 00-4p in failing to ask the VE if her testimony was consistent with the DOT," Pl. Mem. at 21-22; (2) the ALJ acknowledged the "evidence of record" from Dr. Alonso, "but failed to accord any weight to this evidence," id. at 22-23; and (3) the ALJ's decision is not based upon substantial evidence, id. at 23-24.

### A. Failure to Comply with SSR 00-4p

Salati argues that remand is warranted because "the transcripts do not document that ALJ Schiro ever asked VE Howard about whether the latter's testimony conflicts with information provided in the DOT," and because of that "ALJ Schiro failed to fulfill [her] affirmative duty set forth in SSR 00-4p and Hallex I-2-6-74(E)." Pl. Mem. at 22.

SSR 00-4p provides:

> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . and evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, at *4. As the Second Circuit recently explained,

> the Ruling mandates that whenever the Commissioner intends to "rely[ ] on [a] vocational expert's testimony," she must identify and inquire into all those areas

> "where the expert's testimony <u>seems</u> to . . . conflict with the Dictionary." <u>Pearson v. Colvin</u>, 810 F.3d 204, 209 (4th Cir. 2015) (emphasis added). In other words, the Ruling requires the Commissioner to "obtain a reasonable explanation" for any "<u>apparent</u>" — even if non-obvious — conflict between the Dictionary and a vocational expert's testimony. SSR 00-4p, 2000 WL 1898704, at *2 (emphasis added).

<u>Lockwood v. Comm'r of Soc. Sec. Admin.</u>, 914 F.3d 87, 92 (2d Cir. 2019). "Under this SSR, a 'conflict' exists between the testimony of a VE and the DOT when the two disagree in categorizing and describing the requirements of the job as performed in the national economy." <u>Smith v. Colvin</u>, 2017 WL 281736, at *8 (D. Vt. Jan. 23, 2017) (citing <u>Jasinski v. Barnhart</u>, 341 F.3d 182, 184-85 (2d Cir. 2003)).

Here, while the ALJ posed no questions to the VE regarding the DOT, Salati does not identify any apparent conflict between the VE's testimony and the DOT. Because there was no "apparent" conflict, any error in the failure to ask the VE whether the VE's testimony was in conflict with the DOT does not require remand under <u>Lockwood</u>. <u>See</u>, <u>e.g.</u>, <u>Roma v. Astrue</u>, 468 F. App'x 16, 21 (2d Cir. 2012) (summary order) (ALJ not required to make an inquiry under SSR 00-4p because "there was no possible conflict between the vocational evidence about the requirements of a job or occupation and information provided in the DOT") (internal quotation marks and bracketing omitted); <u>Smith</u>, 2017 WL 281736, at *8 ("Here, Smith has not identified a conflict between the VE's testimony and the DOT. Therefore, the ALJ's failure to inquire as to any possible conflicts between the VE's testimony and the DOT constituted at most harmless error.") (citing cases); <u>cf.</u> <u>Lockwood</u>, 914 F.3d at 91-94 (remanding pursuant to SSR 00-4p due to unexplained conflict between the VE's testimony and the DOT); <u>Palacios v. Berryhill</u>, 2018 WL 4565141, at *13 (S.D.N.Y. Sept. 24, 2018) (remanding where the ALJ did not "elicit a reasonable explanation" for a possible conflict "before relying on the [vocational expert] . . . evidence to support a determination or decision about whether the claimant is

disabled") (quotation marks omitted). Because the VE identified multiple jobs that exist in significant numbers in the national economy that a hypothetical individual with Salati's limitations could perform, R. 83-86, and there is no evidence that a person with those limitations could not perform those jobs, Salati's argument does not provide a ground for remand. See Moslow v. Berryhill, 2019 WL 1508045, at *4 (W.D.N.Y. Apr. 4, 2019) ("The Commissioner meets her burden at the fifth step by identifying even a single job that exists in significant numbers in the national economy that the claimant can perform.") (citing Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983)) (additional citations omitted).

Salati also argues that the ALJ failed to comply with the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") § I-2-6-74(E). Pl. Mem. at 22. Similar to SSR 00-4p, Section I-2-6-74(E) of HALLEX provides:

> Before the ALJ may rely on a VE's testimony to support a disability decision, the ALJ must inquire on the record whether there are any conflicts between occupational evidence the VE provided and information contained in the Dictionary of Occupational Titles (DOT), including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), published by the U. S. Department of Labor. The ALJ must identify and obtain a reasonable explanation for any such conflict. The ALJ also must explain in the decision how he or she resolved any identified conflict.

HALLEX § I-2-6-74(E) (S.S.A.), 1993 WL 751902 (last updated June 16, 2016). While the HALLEX affirmatively requires an ALJ to inquire about conflicts, HALLEX does not bind an ALJ. As one case has noted, HALLEX is "simply a set of internal guidelines for the SSA, not regulations promulgated by the Commissioner, and therefore . . . a failure to follow HALLEX does not necessarily constitute legal error" requiring remand. Gallo v. Colvin, 2016 WL 7744444, at *12 (S.D.N.Y. Dec. 23, 2016) (citation and internal quotation marks omitted); accord Dennison v. Berryhill, 2019 WL 2088506, at *8 (W.D.N.Y. May 13, 2019); Paredes v.

Comm'r of Soc. Sec., 2017 WL 2210865, at *16 (S.D.N.Y. May 19, 2017); Smith v. Colvin, 2016 WL 5395841, at *21 (E.D.N.Y. Sept. 27, 2016).  Because the record does not show any conflict between the VE's testimony and the DOT, remand is not warranted.

### B.  Failure to Accord Weight to Evidence from Dr. Alonso

Salati argues that although the ALJ "acknowledged the evidence of record from Dr. Alonso," she "failed to accord any weight to this evidence."  Pl. Mem. at 22-23 (citing R. 24, 27).  Remand is therefore warranted, Salati contends, because the "ALJ failed in her duty to apply the factors listed in" 20 C.F.R. § 404.1527(c)(2).  Id. at 23.

As noted, under the so-called "treating physician" rule, the ALJ must normally give "more weight to medical opinions" from a claimant's "treating source."  20 C.F.R. § 404.1527(c)(2).  The ALJ must first decide whether the treating physician's opinion is entitled to "controlling" weight.  Estrella, 925 F.3d at 95 (citing Burgess, 537 F.3d at 128).  If the ALJ finds the opinion not to be entitled to controlling weight, the ALJ must determine "how much weight, if any" to accord the opinion, explicitly considering the "'Burgess factors,'" id. at 95-96 (citing Selian, 708 F.3d at 418, and Burgess, 537 F.3d at 129), and giving "good reasons" for the determination, id. at 96 (quoting Halloran, 362 F.3d at 32).  As defined in the regulation, "[m]edical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(1); accord Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995) ("The regulations provide that 'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s) . . . .'") (citing 20 C.F.R. § 404.1527(a)(2)).

Here, the ALJ did not err for the simple reason that there are no "medical opinions" from Dr. Alonso contained in the record. Rather, the only record from Dr. Alonso dates from January 2014, when Salati visited for a physical examination. See R. 969-74. The record indicates Salati was seeing Dr. Alonso for the first time since April 2010, a gap of over three years. R. 972. The record states that Salati had "[n]o new complaints," that he was still taking Xanax "for difficulty sleeping," and that he was "in no acute distress, [was] well developed, [and] well nourished." R. 972. Salati also denied symptoms of depression within the last two weeks, had "full range of motion," and "normal" motor strength in "upper and lower extremities" with "sensory exam intact." R. 972. Salati denied shortness of breath, weakness, weight gain and weight loss, among other symptoms. R. 973. He admitted to smoking cigarettes. R. 970, 972. The records indicate Salati was referred to a gastroenterologist for chronic diarrhea and "counselled [sic] on the dangers of tobacco use and urged to quit." R. 973. The ALJ noted that the records from Dr. Alonso indicated "no evidence of acute distress or edema of the extremities," "normal muscle strength in the upper and lower extremities, [] intact sensation," and that feelings of depression in the previous two week were denied. R. 24, 27.[5]

The records from Dr. Alonso do not reflect that Dr. Alonso made any judgments about the nature and severity of any of Salati's impairments. See 20 C.F.R. § 404.1527(a)(1); Diaz, 59 F.3d at 313; see, e.g., Bailey v. Berryhill, 2017 WL 1102671, at *3 (S.D.N.Y. Mar. 24, 2017) ("Because the records of [plaintiff's treating physicians] do not contain 'judgments about the nature and severity of [Plaintiff's] impairment(s),' they are not medical opinions.") (citations omitted). Instead, the records consist of Salati's medical, surgical, social, and family history; his

_____

[5] The ALJ incorrectly identified the record as dating from April 2010 rather than January 2014. See R. 24, 27. However, because the record does not contain a medical opinion and does not reflect any limitations, we do not view this error as significant.

history of present illnesses; and the doctor's examination, assessment, and treatment notes, as already discussed. R. 972-73. Examination findings and treatment plans are not medical "opinions" for the ALJ to have any accorded weight, let alone "controlling" weight. See, e.g., Bailey, 2017 WL 1102671, at *2 (records consisting of treatment notes documenting a claimant's medical history, results of examinations and medical testing, treatment plans and diagnoses, and reported symptoms are not medical opinions under SSA regulations); Mercado v. Astrue, 2010 WL 9478984, at *5 (D. Conn. July 26, 2010) (doctor's "report simply inform[ing] the plaintiff that he had 'several lesions on the corpus callosum' in his brain[] . . . does not constitute a 'medical opinion' and was not entitled to any special consideration by the ALJ"). Further, while "objectives tests" can "support [a physician's] opinion regarding a claimant's functional limitations," Peach v. Astrue, 2010 WL 4609325, at *2 (N.D.N.Y. Nov. 4, 2010), here, the records from Dr. Alonso do not relate in any way to — and certainly do not "support" — the physical and mental limitations Salati claims he experienced during the Relevant Period. Dr. Alonso found that Salati was "in no acute distress," had "full range of motion" in his neck," and "normal" motor strength in upper and lower extremities with "intact" sensory. R. 972. Thus, the ALJ did not err in failing to discuss the factors listed in 20 C.F.R. § 404.1527(c)(2), because factors must be discussed only when an ALJ decides a treating physician's opinion is not entitled to controlling weight. See, e.g., Selian, 708 F.3d at 418.

C. Whether the ALJ's Decision was Based on Substantial Evidence

Salati contends that remand is warranted because the ALJ's decision was not based on substantial evidence. Pl. Mem. at 23-24. Salati claims that the ALJ erred in (1) improperly evaluating the opinions of treating physicians Dr. Chalyaporn Kulsakdinun (Salati's orthopedist) and Dr. David Brizer (his psychiatrist) in according their opinions "some weight," and (2)

26

instead, according "great" or "significant" weight to the "to the opinions of non-treating, one-time consultative examiners" Drs. Dipti Joshi, Joseph Ha, Lawrence Liebman, Dmitri Bougavok, and Arlene Broska. Id. at 24 (citing R. 25, 26, 28). Salati argues the "ALJ's decision is void of an explanation as to why the opinions of the consultative examiners were given greater weight than the two treating physicians." Id. The opinions Salati points to were evaluated by the ALJ during her analysis of Salati's RFC. See Pl. Mem. at 23-24; R. 22-28.

A claimant's RFC is "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996). The SSA has stated that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." Id. at *1; accord Ferraris v. Heckler, 728 F.2d 582, 585 (2d Cir. 1984) ("[I]n making any determination as to a claimant's disability, the Secretary must explain what physical functions the claimant is capable of performing.") (citations omitted). In determining a claimant's RFC, an ALJ weighs the opinions of physicians who have treated or examined the claimant along with other evidence in the record. See, e.g., Distefano v. Berryhill, 363 F. Supp. 3d 453, 471 (S.D.N.Y. 2019).

As previously discussed, a treating source's opinion is given controlling weight if the opinion is well supported by objective medical and clinical evidence in the record; if the opinion is inconsistent with other substantial evidence in the record, however, the opinion need not be given controlling weight. Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)); accord Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). Additionally, an ALJ need not defer to a treating source's opinion on the ultimate issue of

disability.  Snell, 177 F.3d at 133 ("the ultimate finding of whether a claimant is disabled and cannot work" is to be made by the ALJ, and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative"); accord Tracynger v. Comm'r of Soc. Sec., 269 F. Supp. 3d 106, 119 (S.D.N.Y. 2017) (citing cases).  Here, ALJ followed the treating physician rule and properly evaluated the opinion evidence in the record and thus did not err in according only "some weight" to the opinions of Salati's treating physicians.

1. Dr. Kulsakdinun

 Dr. Kulsakdinun opined in September 2011 that Salati could not perform "manual labor due to severe pain" and that he could perform "sedentary work with the following limitations: 3 hours of sedentary work followed by 30 minutes of rest."  R. 854.  In June 2012, Dr. Kulsakdinun opined that Salati would "have difficulty concentrating and doing even sedentary work."  R. 962.

On November 21, 2011, Dr. Kulsakdinun opined that Salati could frequently lift up to 20 pounds and occasionally lift up to 50 pounds.  R. 929, 949.  He could frequently carry up to ten pounds and occasionally carry up to 20 pounds.  R. 929, 949.  He could sit up to eight hours in an eight-hour workday and stand/walk for two hours in an eight-hour workday.  R. 930, 950. The doctor indicated that Salati required a cane to walk.  R. 930, 950.

In a statement dated November 30, 2011, however, Dr. Kulsakdinun reported that Salati had "chronic intractable pain, severe insomnia, [and] severe chronic anxiety, which significantly impairs his vocational, social, and interpersonal functioning."  R. 924.  Even so, he opined that Salati could shop, travel without a companion for assistance, ambulate without using a wheelchair, walker, or two canes, use standard public transportation, prepare a simple meal, and care for his personal hygiene.  R. 925.  He did not fill out the part of the assessment form

indicating Salati's ability to sit, stand or walk.  R. 926.

On June 5, 2012, Salati saw Dr. Kulsakdinun complaining of right leg pain.  R. 961.  The doctor opined that Salati could not do manual labor due to severe pain.  R. 962.  He also opined that Salati's pain was episodic and unpredictable.  R. 962.  He concluded that Salati "will have difficulty concentrating and doing even sedentary work."  R. 962.

On April 2, 2014, Dr. Kulsakdinun completed a medical source form.  R. 976.  The doctor opined that Salati could occasionally lift/carry up to 20 pounds (with the right hand).  R. 976.  He could sit continuously for one hour, stand continuously for two hours, and walk less than one block.  R. 977.  On the same day, the doctor noted Salati may "at best be able to do sedentary work but may have problems due to his neurologic issues and difficulty with concentration which needs to be evaluated by neurology."  R. 985.

The ALJ could properly accord Dr. Kulsakdinun's opinions regarding Salati's ability to perform sedentary work only "some" weight.  R. 24.   As the ALJ noted, R. 28, Salati returned to work after his accident in 1999 and that he worked for years afterwards, including as a construction foreman, ending only in 2010.  See R. 535, 563 (detailing Salati's earnings).  Notwithstanding his testimony to the contrary, R. 55, the evidence suggests that Salati left his job due to a slowdown in work at the company.  For example, in his initial Disability Report, Salati stated: "I was let go because the company was slowing down."  R. 579 (capitalization omitted).  At his June 2014 hearing, Salati acknowledged that he collected unemployment insurance for about a year after he was laid off, and in regard to the insurance, certified that he was "ready, willing, and able to work full-time in [his] normal job capacity."  R. 158.  He made similar comments during a subsequent exchange with the ALJ.  R. 159-60 ("I was laid off, and I collected unemployment, and after that [I] never worked again. . . .  The job ended and there was

no more work.  So, they put me on unemployment automatically.  So, when the unemploy[ment] was over, it was over, and that was it.  I could go back to work.").

Additionally, there was other evidence showing that Salati's ability to perform simple work tasks was not impeded.  For instance, in April 2011, consultative psychiatrist Dr. Bougakov noted that while Salati's memory was impaired, his attention and concentration was "[m]ainly intact" and his cognitive functioning was in "the average range."  R. 727-28.  Dr. Bougakov found that Salati could "follow and understand simple directions and instructions, can perform simple tasks, can maintain attention and concentration, and maintain a regular schedule."  R. 728.

Consultative psychologist Dr. Broska concluded in August 2014 that Salati has average cognitive functioning and that his attention and concentration were intact.  R. 1012.  Dr. Broska determined that "[v]ocationally, there is no evidence of psychiatric limitation in the claimant's ability to follow and understand simple directions and instructions, [and] perform simple tasks independently."  R. 1013.  And while Dr. Broska noted that cognitive problems may have an impact on the ability to function on a daily basis, she found that the results of her examination "do not appear to be consistent with any psychiatric problems that would significantly interfere with the claimant's ability to function on a daily basis."  R. 1013.

 Treating physician Dr. Alonso noted in January 2014 that Salati's sensory was "intact," R. 972, and consultative orthopedist Dr. Ha noted in August 2014 that his examination found "[n]o sensory abnormality."  R. 1021.  Similar results were found more recently and outside the Relevant Period, see, e.g., R. 1077 (May 2016 pulmonary medicine office visit report noting "[n]o weakness, numbness, tingling, or tremors" as to neurological symptoms), and dating back closer to the 1999 car accident, see, e.g., R. 896 (July 2001 Montefiore Medical Center report

noting physical examination found "good strength" "[n]eurologically").  Dr. Kulsakdinun's own assessments from March and September 2011 noted that Salati denied any musculoskeletal or neurological symptoms.  R. 853, 871.  Additionally, Salati testified several times from 2012 to 2017 regarding his ability to watch television, read the newspaper, paint, drive a car short distances, keep in touch with people on Facebook, and spend time socializing with friends and family.  R. 68-69, 70-71, 108-10, 173-74, 180, 212.

The ALJ could properly rely on this evidence in assigning "some" weight to Dr. Kulsakdinun's opinions regarding Salati's inability to perform sedentary work due to issues with concentrating or neurologic deficiencies, even considering evidence suggesting Salati did have neurological symptoms and instances of trouble concentrating.  See, e.g., R. 720 (June 2011 notes from treating physician Dr. Brizer noting Salati could only recall "1 out of 3 objects . . . after 5 mins"), 710 (physical consultative examiner Dr. Joshi diagnosing Salati in March 2011 with "[l]eft hand numbness and pain").  This is because even if Dr. Kulsakdinun's opinions were supported by other objective medical evidence, it is within the ALJ's discretion to resolve "[g]enuine conflicts in the medical evidence."  Veino, 312 F.3d at 588; see also Alston, 904 F.2d at 126 ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")

With respect to Dr. Kulsakdinun's opinion that Salati could perform "sedentary work" limited to "3 hours of sedentary work followed by 30 minutes of rest," that opinion is not supported by any findings in Dr. Kulsakdinun's own report aside from the notation of pain and limited range of motion in the right knee, ankle, and left wrist.  R 854.  There is simply no explanation or treatment note justifying why every three hours of sedentary work would need to be followed by 30 minutes of rest.  Thus, the ALJ could properly give this opinion only "some"

weight. And with respect to the portions of Dr. Kulsakdinun's opinions that Salati could not perform manual labor and could at most perform sedentary work due to neurological complications and difficulty concentrating, R. 854, 962, 985, the ALJ addressed those impairments by limiting Salati to "simple, routine tasks at the sedentary exertional level," R. 22.

As to the portion of the Dr. Kulsakdinun's opinion regarding Salati's sit/stand limitations, the doctor's views varied widely. In the same month as he opined on significant limitations in sitting/standing, Dr. Kulsakdinun opined that Salati could sit up to eight hours in an eight-hour workday and stand/walk for two hours in an eight-hour workday. R. 930, 950. Salati himself stated that from 2008 to 2010, he engaged in construction work, which required him to walk and stand for eight hours in a day (with breaks in between). R. 598. Salati points to no evidence in the record suggesting that his symptoms or limitations worsened since then, and thus the ALJ could properly find that Salati would not be able to perform sedentary work with five-minute breaks for every hour of sitting, which is what the ALJ limited him to. R. 22.

2. Dr. Brizer

On April 1, 2011, Dr. Brizer opined that Salati could not function in any structured work setting because of "chronic, persistent pain, orthopedic [and] neurologic damage." R. 720. He opined that Salati could frequently lift and carry up to five pounds; stand and/or walk less than two hours per day; sit for up to six hours; and could not push and/or pull. R. 721-22. The doctor opined that Salati was limited in his ability to understand and remember due to short term memory deficits. R. 722. He further opined that Salati was limited in the area of "Susatained Concentration and Persistence" due to "chronic pain [and] limited range of motion, blindness." R. 722. He also found that Salati's ability to socially interact was "limited by intolerance of sitting/standing for extended periods of time." R. 722. Dr. Brizer also opined that Salati's

"ability to do work related to mental activities" was limited in four areas: understanding and memory, sustained concentration and persistence, social interaction, and adaption.  R. 722-23.

The ALJ could properly assign these opinions only "some" weight because they are inconsistent with other record evidence.  First, the opinions were inconsistent with the fact that Salati had only recently completed a lengthy work history that followed his accident.  Second, Dr. Brizer's opinions that Salati had limitations in sustained concentration and persistence and social interaction were offered only through checking a box, and are otherwise "totally devoid of explanation as to how he arrived at those assessments."  Pollino v. Comm'r of Soc. Sec., 366 F. Supp. 3d 428, 437 (W.D.N.Y. 2019); accord Dawn P. v. Berryhill, 2019 WL 1024279, at *6 (N.D.N.Y. Mar. 4, 2019) ("courts have routinely recognized the failure to provide a requested narrative explanation on a check box form as a legitimate reason for affording a treating source opinion limited weight") (citing cases); see also Rivera v. Berryhill, 2018 WL 1521824, at *5 (D. Conn. Mar. 28, 2018) ("The Second Circuit has consistently held that opinions rendered on 'check-box' forms are often the ones that offer little meaningful insight into the basis for the clinician's findings.") (citing Klodzinski v. Astrue, 274 F. App'x 72, 73 (2d Cir. 2008)) (addition citation omitted).  Although Dr. Brizer provided support for his opinion by stating that Salati could only recall "1 out of 3 objects . . . after 5 mins," R. 720, we have already detailed, see section III.C.1 above, the substantial evidence the ALJ could properly rely on in concluding that Salati's ability regarding understanding and memory was not severely limited as to preclude him from performing simple work tasks.  See R. 727-28, 1011, 1013, 1015.

Finally, to the extent Salati argues the ALJ committed error in according "great or significant weight" to the opinions of non-treating consultative examiners that Salati's impairments were not as severe as he claimed, we reject that argument because the ALJ properly

found those opinions to be consistent with substantial evidence in the record for reasons already given. See Diaz, 59 F.3d at 313 n.5 ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record."); accord Suttles v. Colvin, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (no error by ALJ to give great weight to consultative examiner's opinion because it was consistent with record evidence). We also reject Salati's contention that the ALJ's written decision "is void of an explanation" as to why those consultative examiner opinions were accorded greater weight than those of Drs. Kulsakdinun and Brizer. The ALJ discussed at length the opinions Salati references in his brief. And while the ALJ did not always repeat the exact reasons for rejecting or accepting certain opinions, the evidence summarized in the ALJ's decision, as well as the record as a whole, provides a basis for the ALJ to make those determinations. See Mongeur, 722 F.2d at 1040 ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient . . . .") (citation omitted).

IV. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 17) is granted and Salati's motion (Docket # 15) is denied.

SO ORDERED.

Dated: New York, New York
November 14, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

34